ATTORNEYS FOR THE APPELLANTS,
CROSS-APPELLEES
James F. Groves
David E. Ballard
South Bend, Indiana

ATTORNEY FOR THE APPELLEES,
CROSS-APPELLANTS
James A. Masters
South Bend, Indiana



FILED

Jun 22 2010, 10:22 am

CLERK
of the supreme court,
court of appeals and
tax court

## In the
## Indiana Supreme Court

No. 71S00-0912-MF-569

IN THE MATTER OF MANDATE OF FUNDS;

ST. JOSEPH COUNTY COMMISSIONERS AND ST. JOSEPH COUNTY COUNCIL,

*Appellants, Cross-Appellees,*

v.

THE HON. PETER J. NEMETH AND THE ST. JOSEPH PROBATE COURT,

*Appellees, Cross-Appellants.*

Appeal from the St. Joseph Probate Court,
Nos. 71J01-0902-JM-1, 71J01-0902-JM-2, and 71J01-0902-JM-3
The Hon. William F. Satterlee, III, Special Judge

On Automatic Review Pursuant to Trial Rule 60.5(B) and Appellate Rule 61

**June 22, 2010**

**Sullivan, J.**

This case addresses disputes between the St. Joseph Probate Court and the St. Joseph County Commissioners over land, renovations, and salaries at the Thomas M. Frederick Juvenile Justice Center in St. Joseph County. As explained below, we approve certain renovations such

as those prompted by the need to close down some residential sections of the Center to save money. We disapprove the mandate for a new courtroom and most of the mandated salary increases. We remand the dispute over land adjoining the Center for an adjudication on the merits.

## Background

Thousands of Hoosiers of every kind and station come to Indiana's trial courts each day to vindicate their legal rights and seek protection for their nearest and dearest interests. The constitutions and laws of our land demand that trial courts and their judges have the resources they need to resolve these cases promptly and fairly.

Indiana law imposes on county government the obligation for funding the majority of court operations. County government also has the obligation for funding many other important services. These are challenging obligations in any circumstances and they are particularly difficult in the present.

From time to time – as has happened in this case – a disagreement over court resources between a judge and county government will prove to be so intractable as to require litigation. In 1976, this Court adopted T.R. 60.5, establishing orderly procedures for the resolution of intra-county disagreements about court funding. We adopted the rule after studying the report of a legislative joint committee that held hearings attended by judges and by many representatives of county government. See Chief Justice Richard M. Givan, Ind. Supreme Court, "1977 State of the Judiciary" (Jan. 12, 1977), reprinted in "Justice Shall Be Administered Freely": State of the Indiana Judiciary 1973-1987, at 32-34 (Ind. Supreme Court 2009).

In 2008, an informal working group of county government representatives and trial court judges proposed to us several changes in T.R. 60.5. First, they suggested that the rule explicitly provide for referring such disagreements to mediation. Second, they suggested that when it became necessary to appoint a special judge to adjudicate such disagreements, that special judge not be a sitting or prior judge but instead a practicing lawyer. And third, they suggested that the rule specify that any attorney fees awarded by a special judge in such cases be paid at a rate not

2

greater than the reasonable and customary hourly rate for an attorney in the county. We very much appreciated the suggestions of the working group and adopted their proposals by Order dated February 4, 2009.

This is the first case utilizing the 2009 amended procedures of T.R. 60.5.

The St. Joseph Probate Court, which has exclusive juvenile jurisdiction in St. Joseph County pursuant to Indiana Code Section 33-31-1-9(b), operates the Thomas M. Frederick Juvenile Justice Center ("Center"). The Center includes a juvenile detention facility that can accommodate approximately 90 juvenile detainees when fully operational, the probate and juvenile court facilities, the juvenile probation department, and the office of the court appointed special advocate ("CASA").

On February 4, 2009, the Probate Court and the Honorable Peter F. Nemeth, as judge thereof (collectively "court"), issued three mandate orders related to the Center. The parties call the order involving land "Mandate 1," the order concerning renovations "Mandate 2," and the order related to salaries "Mandate 3." This opinion does likewise.

In Mandate 1, the court states that when the County adopted an ordinance for issuance of bonds for the construction of the Center in 1993, the ordinance provided that the bond proceeds were to be used to pay for the cost of acquiring, constructing, and equipping the Center, which was to be located in an area bounded by four named streets. The bonds were accompanied by an official statement declaring that the proceeds were to be used to purchase land and construct and equip the Center. As constructed, the Center stands on the western part of the designated land, while the eastern part of that land remains undeveloped.[1]

After Ivy Tech State College expressed an interest in purchasing the eastern part of the land, the court met with the St. Joseph County Commissioners and stated that the eastern land is

---

[1] The court reports that the Center's employees maintain the eastern land (cutting the grass, trimming the trees, and clearing debris) and have done so since the Center opened. (Appellee's Br. at 3; Appellee's Reply Br. at 4.)

necessary for effective operation of juvenile justice in the County. Determining that the Commissioners would sell off the eastern land unless ordered otherwise, the court issued Mandate 1, stating that a transfer of the land to Ivy Tech or another buyer would violate the terms of the bond issue and restrict the ability of the court to expand the Center or juvenile services in the future. Mandate 1 directs that the Commissioners shall not sell, assign, or otherwise transfer any interest in the land without the court's consent.

Relevant to Mandate 2, the court in November 2008 proposed certain renovations in the Center, replacement of some of its equipment, and transfers of funds within court-related accounts in the County's 2008 budget to make available money for those renovations and replacements. A bill transferring the sum of $401,929 from various court-related accounts within the County's 2008 budget to other court-related accounts within the budget was approved by the St. Joseph County Council and the Commissioners in December 2008.[2] But later that month when the court timely submitted specific purchase order requests accompanied by vendor/contractor estimates, quotes, and proposals for particular renovations and replacements, the Commissioners did not approve many of the purchase order requests. Mandate 2 describes the unapproved purchases as necessary to juvenile justice in the County and orders the Council and the Commissioners to approve purchase order requests totaling $313,788.74.[3]

Prior to Mandate 3, the court submitted to the Council and Commissioners a budget request for 2009 that included $60,208 in annual raises for eight employees at the Center: two court employees and six employees of the juvenile detention facility. Judge Nemeth met with the Council and Commissioners (hereinafter collectively "Commissioners") and attempted to demonstrate the need for those raises, but the Commissioners did not approve them. Mandate 3 orders the Commissioners to approve the appropriation of funds for those raises and to use the County's supplemental Juvenile Probation Services Fund ("JPS Fund") to pay for the raises.

---

[2] The specific accounts to which the amounts were transferred bear names such as "Buildings & Structures," "Repairs – Building & Structure," "Furniture & Fixtures," "Other Contractual Services," etc. (Petitioner's Ex. 1.)

[3] The Commissioners later approved one of the mandated expenditures ($19,528 for improvements to the CASA office), reducing the total amount that remains in contention. (Tr. at 32, 48.)

Each mandate included an order that the Commissioners appear before the court and show cause why the mandate should not continue in full force and effect.

The Mandates at issue in this case were issued by Judge Nemeth on February 4, 2009. As such, they triggered the procedures of T.R. 60.5 as newly amended.

Initially, we referred these cases for mediation. When mediation proved unsuccessful, we appointed William F. Satterlee, III, a practicing lawyer in Valparaiso, as special judge to hear the matters and make findings regarding the mandates.

The Commissioners filed a motion to dismiss Mandates 1 and 3, alleging that they exceed the court's mandate authority. On September 1, 2009, the special judge issued a preliminary order that vacated Mandate 1 in its entirety and declared Mandate 3 vacated to the extent it identified the JPS Fund as the source for payment of the raises.

On September 23 and 24, 2009, the special judge held a trial on Mandate 2 and Mandate 3 as modified. At the beginning of the hearing, the special judge allowed the court to amend Mandate 3 to delete the reference to the JPS Fund in response to the special judge's preliminary order. On October 28, 2009, the special judge issued an Order and Judgment upholding Mandate 2 and Mandate 3 as amended and ordering the Commissioners to pay the court's counsel $18,425 in attorney fees. The special judge certified his judgment on December 9, 2009. We express our appreciation to Special Judge Satterlee for his service.

Trial Rule 60.5 provides that the special judge's decree be reviewed by this Court unless the responsible governmental entities expressly waive review. Review was not waived here, so we issued an order governing the filing of the record on appeal and briefing. The Commissioners appeal aspects of the final judgment, while the court cross-appeals aspects of the preliminary order. The parties concluded briefing on May 14, 2010, and we took this case under advisement.

5

## Discussion

### I

Intra-county disputes between the judiciary and a county's legislative and executive authorities are almost always resolved without resort to the extraordinary mandate procedures provided in T.R. 60.5. In the Matter of Assignment of Courtrooms, Judge's Offices, and Other Court Facilities of St. Joseph Super. Ct., 715 N.E.2d 372, 373, 376 (Ind. 1999). "[A] mandate proceeding is not a review of whether the position taken by the governmental entity with regard to court operations is arbitrary or capricious." Id. at 375. "The issues to be decided in a mandate proceeding are whether the funds ordered paid are reasonably necessary for the operation of the courts and any court-related functions and whether any specific fiscal or other governmental interests are so severely and adversely affected by the payment as to require the order to be set aside." Order for Mandate of Funds Montgomery County Council v. Milligan, 873 N.E.2d 1043, 1045 (Ind. 2007) (citing In re Court Reporter Salaries in the Knox Cir. and Super. Cts., 713 N.E.2d 280, 282 (Ind. 1999)). A court need not wait to take action until the court's operation actually has been impaired, but may act once there is a clear and present danger of impairment. Id. at 1046 (citing Morgan Cir. Ct. v. Morgan County Council, 550 N.E.2d 1303, 1304 (Ind. 1990)). In sum, a proceeding under T.R. 60.5 balances an actual, or clear and present danger of, impairment of necessary court operations with the extent to which specific fiscal or other governmental interest would be adversely affected by the mandate.

With these standards in mind, we consider first the decree upholding Mandate 2 and Mandate 3 as amended. We then examine the dismissal of Mandate 1, which the court cross-appeals. Finally, we address attorney fees.

### II

Mandate 2 orders the Commissioners to approve expenditures for renovation of the Center and replacement of some of its equipment. The special judge determined that the expenditures requested and mandated by the court are reasonably necessary to the operation of the court

and court-related functions.  As detailed below, we agree that some of the expenditures are reasonably necessary but conclude that some are not.  We begin with expenses that the record shows are reasonably necessary.

Expansion of Day Reporting Program.   The court mandated a total of $57,796.50 in expenditures for the expansion and move of the court's Day Reporting program ("Day Reporting") to the basement floor of the Center.  These expenses include $46,527 to renovate office space that had been used by the Department of Child Services until December 2008.  This renovation includes replacement of carpet and construction, repair, and painting of walls.  The total also includes $722 for a computer connection system, a $7,450 security system, and $3,097.50 in moving costs.

Judge Nemeth testified regarding the need for moving and expanding Day Reporting. Juveniles ordered into Day Reporting go to the Center with a parent to participate in programs, therapy, and counseling "to make sure whatever problems are going on in the family are being addressed in the hope that the child c[an] be rehabilitated and not recidivate."  (Tr. at 21, 37, 55, 159.)   Day Reporting allows the court to monitor and regulate what juveniles who are ordered into the program do when they are not in school or at home.  It is often the last "step" or disposition before a juvenile is sent to the Boys' School or Girls' School.

Judge Nemeth explained that in order to comply with the Commissioners' request that the court cut the Center's 2007 budget by 4.5%, he closed one half of a residence pod[4] in the detention facility.  He testified that to meet the Commissioners' request to cut the 2008 budget by 8%, he closed another full pod, leaving only three and one-half pods operational in the detention facility.  These closures reduced the capacity of the detention facility from 90 to 63 juveniles. Judge Nemeth explained that the closures require that a larger number of juveniles be placed in Day Reporting and an expansion and move of Day Reporting to the Center's lower level to accommodate a greater number of juveniles.

---

[4] A pod contains 18 beds.  (Tr. at 16.)

The Commissioners argue the mandate for expenditures related to Day Reporting cannot be sustained where there was no evidence showing an *actual* increase in the number of juveniles ordered into Day Reporting after the pod closures. They note that Judge Nemeth admitted at trial that he did not believe there had been an actual increase yet in the number of those ordered into Day Reporting. They also claim there was no evidence showing that the court needs a larger space for Day Reporting.

We disagree with the Commissioners. Judge Nemeth explained, "I don't believe there has been any increase because they can't handle it." (Tr. at 54-55.) He testified that Day Reporting is already at capacity and cannot accommodate a larger number of juveniles without moving. He added that as a result of Day Reporting not being able to expand, juveniles who should be in Day Reporting are either being sent to the Department of Correction or allowed to remain in the community without the kind of monitoring and services they require. (Tr. at 55.) "[W]e are just having to release children into the community without having the kind of supervision which, I believe, we need under the circumstances," he added. (Tr. at 53.)

This evidence shows that with the closing of the detention pods, it was appropriate for the court to order a greater number of juveniles into Day Reporting, and it is reasonable to infer that if more juveniles are ordered into Day Reporting, that program will need more space to accommodate the greater number. The evidence shows that an expansion and move of Day Reporting, and the mandated expenses association therewith, are reasonably necessary for the court or a court-related function.

Automobiles. The Center has two vans to transport juvenile detainees to receive medical and dental care: a 1998 Ford Windstar with 87,000 miles on it, and a 2000 Ford Windstar with 122,000 miles on it, poor alignment, and a cracked bumper. Center personnel report the vans have broken down occasionally with juveniles in them. In fact, the 1998 Windstar was inoperable for the six months preceding the trial. Agents of the court attempted to obtain use of another vehicle through the Sheriff's Department but learned that none was available. The court obtained a quote of $24,450 to replace the two vans with two newer used vehicles with fewer miles on them. The $24,450 purchase price includes a trade-in of the two Windstars. When the Com-

missioners failed to authorize that expenditure, the court mandated that the Commissioners approve it.

The Commissioners do not appear to challenge whether the purchase of the replacement automobiles is necessary. They contend that although the expense "may be necessary," it is beyond the mandate power of the court. (Appellants' Br. at 42.) The Commissioners insist that the automobile expenses "are for the detention center and have nothing to do with operating a court[.]" (Id. at 42.)

We reject the Commissioners' argument regarding the automobile expense. The mandate procedure is available to protect the operation of a court or *court-related* functions. T.R. 60.5(A). Here, the parties have acknowledged that the court operates the juvenile detention facility. A juvenile court's authority to establish and operate a juvenile detention facility for children is recognized in Indiana Code Section 31-31-8-3.[5] Because the court operates the juvenile detention facility at the Center, the care of those children, including their safe, reliable transportation for medical and dental services, is a court-related function for purposes of T.R. 60.5. See Vigo County Council v. Vigo Super. Ct., Div. 1, 272 Ind. 344, 397 N.E.2d 969, 971-72 (1979) (affirming mandate for salary expenses for the juvenile detention center that was part of the juvenile division of the superior court).

Washing Machine. The Center's juvenile detention facility includes a laundry to clean the clothes, towels, and bedding used by detained juveniles. The court mandated the expenditure of $990 for a new front-load washing machine for the Center. Judge Nemeth testified that the new washer is necessary. The Commissioners do not seem to challenge whether a new washer is necessary. They contend that although the expense "may be necessary," it is beyond the mandate power of the court because a washing machine has nothing to do with the operation of a court. (Appellants' Br. at 42-43.) However, we reject the Commissioners' argument for reasons similar to those stated when discussing the automobiles. Hygiene and the laundry required to

---

[5] This statute makes an exception "as provided by IC 31-31-9," a chapter that does not apply to St. Joseph County.

maintain it are part of the operation of the juvenile detention facility, a court-related function for purposes of T.R. 60.5.

Carpet.  Mandate 2 requires the expenditure of $40,556 for the replacement of carpeting in the detention pods.  Judge Nemeth testified that the carpet in the detention pods is twelve years old and "desperately needs to be replaced."  (Tr. at 208.)   He explained the carpet is well worn and should be replaced both for the sake of its appearance and for the sake of its function.  He does not want anyone "tripping on a torn rug and suing the County for damages."  (Tr. at 38.)  The Commissioners argue that although this expense for carpet "may be necessary," it is simply beyond the mandate power of a court because the expense is not reasonably necessary for the operation of the court or a court-related function.  (Appellants' Br. at 43.)  But for the reasons stated when discussing the automobiles and washing machine, we conclude that the expense of replacement carpet in the detention pods is reasonably necessary for a court-related function for T.R. 60.5 purposes.

We turn to examine those mandated expenditures that are not supported by the record.

New Courtroom.  The court mandated expenditures of $165,000 to convert space previously used as a CASA office into an additional courtroom.  The court currently has four courtrooms, enough for the court's judge and three magistrates.  The court has a senior judge, J. Eric Smithburn, who can hear cases in a courtroom that is not being used by Judge Nemeth or one of the magistrates.  Judge Nemeth testified that the new courtroom would be for the senior judge, who currently is able to sit either one day or one-half day per week.  (Tr. at 34, 154.)  He added that the court's business is increasing dramatically and that a new courtroom would help the court handle the increased volume because "the Senior Judge would not be limited to an occasional opportunity to use a courtroom."  (Tr. at 34.)  When asked how often the senior judge would be able to hear cases if a new courtroom were constructed, Judge Nemeth responded, "[I]t would be more than one day per week.  I can't guess."  (Tr. at 35.)

The caseload statistics reported by the court for 2007 through 2009 show basically stable numbers of new filings for those three years: 5,822 cases in 2007, 6,117 cases in 2008, and 5,929

10

cases in 2009 (toward the end of which Judge Nemeth testified). See Indiana Supreme Court, Division of State Court Administration, 2007 Judicial Service Report: Caseload Statistics (Vol. II); 2008 Judicial Service Report: Caseload Statistics (Vol. II); and 2009 Caseload Statistics (on file with Division of State Court Administration). Additionally, Judge Nemeth admitted the senior judge would not be able to use the proposed new courtroom on either a full-time or daily basis. (Tr. at 154, 207.) He presumes that Smithburn, a professor at the Notre Dame School of Law, is a full-time faculty member. (Tr. at 153.) Judge Nemeth acknowledged that the senior judge is able to work only thirty days per year as special judge, but he suggested that the court might obtain the services of another senior judge or request an additional magistrate in the future. (Tr. at 206, 225-26.)

This evidence is insufficient to establish that the current arrangement of sharing courtrooms does not allow the court to operate effectively or that a new courtroom is reasonably necessary to the court's operation.

Chairs. The court mandated expenditure of $5,468.24 for posture support chairs for use by the magistrates and court reporters in two existing courtrooms and for use in the new courtroom to be constructed. That amount reflects the cost of eight chairs at $672.28 each, plus a single $90 fee for installation. Judge Nemeth explained, "[W]e do a lot of sitting and these chairs are quite helpful from [sic] avoiding back problems and other problems[.]" (Tr. at 202.) He stated the existing courtrooms' chairs are twelve years old.

Because the record does not show a new courtroom is reasonably necessary, the new chairs for that proposed courtroom are not necessary. Moreover, we agree with the Commissioners' argument that absent some other evidence concerning the condition of the chairs in the existing courtrooms, their age alone does not prove that the court needs new chairs in order to operate.

11

**III**

Mandate 3 requires the Commissioners to approve and pay annual raises totaling $60,208 for eight Center employees. The special judge upheld that mandate, concluding that the salary increases are reasonably necessary for the operation of the court or a court-related function. (Appellants' App. at 28.) The Commissioners appeal that determination.

The annual salaries of court employees fall within a court's mandate authority and may be ordered paid at levels sufficient to attract and retain qualified persons. Order for Mandate of Funds Montgomery County Council, 873 N.E.2d at 1045-46. A court need not wait to take action until the court's operation actually has been impaired, but may act once there is a clear and present danger of impairment of the court's operation. Id.

The Commissioners first argue that a mandate cannot be used for the salaries of employees in the juvenile detention facility of the Center (a majority of the employment positions at issue here) because they do not perform court-related functions. We disagree with the Commissioners on this point. As noted, the court operates the juvenile detention facility at the Center. Therefore, employment of detention personnel is a court-related function for purposes of T.R. 60.5. See Vigo County Council, 397 N.E.2d at 971-72 (affirming mandate for salary expenses for the juvenile detention center that was part of the juvenile division of the superior court).

The Commissioners next challenge the conclusion that these mandated raises are reasonably necessary to attract and retain qualified persons. To address this argument, we summarize here the probative evidence as it relates to each of the eight employment positions. First, we use a chart showing each position's annual salary for 2008, the mandated raise, and the resulting annual salary. The chart also includes a proposed or recommended salary range contained in the "Job Classification and Compensation Project" report ("JCCP report") prepared by consultants for the County and the Commissioners in August 2006. The report is the result of the County's study to "determine the fair levels of salaries for certain categories[.]" (Tr. at 164.)

The chart is followed by information specific to each position.

| Position | 2008 Salary | Mandated Raise | Resulting Annual Salary | JCCP Proposed Salary Range |
|---|---|---|---|---|
| Executive Secretary | $29,183 | $6,817 | $36,000 | $26,000 -- $34,642 |
| Fiscal Officer | $29,491 | $10,000 | $39,491 | $28,540 -- $37,734 |
| Executive Director | $82,375 | $20,000 | $102,375 | N/A |
| Security Director | $40,083 | $4,008 | $44,091 | N/A |
| Controller | $34,765 | $5,476 | $40,241 | $31,541 -- $41,047 |
| IT Coordinator | $41,750 | $7,190 | $48,940 | $38,635 -- $52,092 |
| Bookkeeper | $27,093 | $2,709 | $29,802 | $28,540 -- $37,734 |
| Food Serv. Supervisor | $40,083 | $4,008 | $44,091 | $35,843 -- $46,506 |

Executive Secretary.   The court's executive secretary ("secretary") serves the court's one judge and three magistrates and acts as a back-up court reporter if the regular court reporter is absent.  As of 2008, the secretary had not received a raise for six years, with the exception of a $550 raise in 2005.  Judge Nemeth testified that a secretary who previously worked for the court had been earning $28,000 annually when she left for a federal job that paid $42,000, though he did not specify the nature of the federal job.  (Tr. at 73.)

The secretary who works for the chief judge in the Superior Court earns approximately $36,000.  In 2008, Judge Nemeth and the judge of the Circuit Court requested raises for their respective executive secretaries; the secretary in the Circuit Court received a raise to $36,000 but Judge Nemeth's secretary did not.

When Judge Nemeth met with the Commissioners to request the raises for the eight employees and when he later ordered the raises, he referred them to the JCCP report.  The JCCP report reflects that the secretary's current salary is within the recommended salary range of $26,000 to $34,642 for that position and that the mandated $36,000 salary exceeds the salary range for that position.  (Tr. at 72-73; Petitioner's Ex. 5.)

Fiscal Officer.  The fiscal officer assists the court in collecting probation user fees.   The fiscal officer meets with parents, uses certain guidelines to assess how much parents should pay for services provided to their children, and sends out bills to those parents.  Judge Nemeth testified that in the private sector, an employee in such a position would be compensated on a commission basis, but he could not figure out how to do that with a governmental employee.  He tes-

13

tified that the person who had been working in the job for many years left and that the job was vacant at the time of trial in September 2009. He stated that person left in June 2009 "because of the money" after she warned she could not continue to work at the same rate of pay, but the judge admitted that he did not know what she was earning at her new job at a cancer society. (Tr. at 166.)

A probation officer has helped fill in after the fiscal officer left, though Judge Nemeth stated the court was not collecting as much money as before. He expressed that the reduction in collection presents a "clear and present" danger to the court but did not elaborate on the amount of the reduction or explain specifically how the function of the court would be harmed, other than saying the County needs all the money it can get. (Tr. at 169.)

Between 2003 and 2009, the fiscal officer received a $550 raise in 2005. Judge Nemeth expressed that the 2008 salary for that position is not sufficient for that kind of work. He acknowledged that the $10,000 raise ordered would result in an annual salary that exceeds the proposed range of $28,540 to $37,734 in the JCCP report, but he opined that "some catching up" is needed. (Tr. at 84.)

Executive Director. The executive director serves as the Center's administrator, oversees the Probation and Detention Departments, and "basically, operates the building." (Tr. at 88.) The current executive director is a forensic psychologist who formerly worked for the Department of Correction. Judge Nemeth testified that he reviewed salaries on the Internet and found that "[m]ost of the salaries for this kind of job run from $105,000.00 to $150,000.00 a year," though he did not explain in what part of the country those jobs were located. (Tr. at 87.) He testified that assistant principals in the local school system make $98,000 per year.

The JCCP report contains no recommended salary range for the executive director but did recommend that "compensation for Chief Deputies of elected officials be tied directly to that of their elected official." (Petitioner's Ex. 5.) Judge Nemeth described the executive director as his "right hand." (Tr. at 86.) He explained that the executive director's current salary was fixed at a time when the salary for a magistrate was $80,000, though magistrates' salaries have since in-

14

creased to $100,000, approximately 80% of what a judge earns, while the executive director's has not. (Tr. at 87.) Judge Nemeth is concerned that if the "right proposal c[omes] along," his executive director will leave and could not be replaced with a qualified person at the current salary. (Tr. at 89-90, 175-77.) The Judge admitted that the executive director has not told the judge that he will leave if he does not receive a raise. (Tr. at 177.)

Security Director. The security director is responsible for security of the courtrooms, including the entrances and the lobby, and with monitoring the parking lot. Judge Nemeth explained that only one deputy sheriff is now assigned to the court. (Tr. at 91, 177.) The Judge acknowledged that he does not know whether the Circuit and Superior Courts have anyone other than sheriff's department personnel to provide security. No raise has been provided for the security director since 2003, with the exception of a small raise in 2005. The JCCP report lists no recommended salary range for this position. There was no evidence of salaries for a comparable position.

Controller. The court's controller "handles the books," is responsible for administering the payroll, and assists with budgeting and purchases. (Tr. at 92-93.) Between 2003 and 2008, the controller received only one raise, an increase of $550 in 2005. The controller's current salary and the salary that would result from the mandated raise are within the JCCP report's recommended salary range of $31,541 to $41,047. Although the controller has asked whether there will be raises, he has not made any direct comment indicating an intent to leave. (Tr. at 207.)

IT Coordinator. The information technology coordinator is responsible for the operation of the computer system used at the Center. The person who currently occupies the position worked previously as a probation officer. He had been making $48,000 annually as a result of a supplement provided by a grant from the Department of Correction, but that grant is no longer available to supplement his salary. Both the current salary and the salary that would result from the ordered raise are within the JCCP report's recommended salary range of $38,635 to $52,092.

Judge Nemeth expressed concern because it is "possible" – depending on the current IT coordinator's experience and the extent of his education – that the IT coordinator could make

15

more money as a probation officer and, if the raise does not occur, may want to return to employment as a probation officer. (Tr. at 96-97.) Judge Nemeth admitted he does not know the IT coordinator's level of education. (Tr. at 179.) He testified that the IT coordinators in Allen and Marion Counties make $60,000 and $80,000 respectively, but each of those counties is a considerable distance away and the court provided no comparison of all of the responsibilities of the IT coordinators in the three counties.

Bookkeeper. The bookkeeper is the controller's assistant and helps perform the same duties as the controller. Judge Nemeth testified the bookkeeper position was vacant at the time of trial and had been for one year, requiring the controller to "pick up the slack." (Tr. at 168.) He stated, "We have not been able to find a qualified person to take that job at that pay." (Tr. at 97.) The bookkeeper's annual salary for 2008 is below the lower end of the JCCP report's recommended salary range of $28,540 to $37,734. Judge Nemeth testified that the bookkeeper left for a federal job "probably, at a 50 percent increase in pay," though he acknowledged the County cannot compete with salaries offered by the federal government and he did not know whether the bookkeeper would have stayed even if she had received the mandated raise. (Tr. at 167.)

Food Services Supervisor. The food services supervisor ensures that the children detained at the center receive three meals and a snack each day. The Center has three or four cooks in all, depending upon turnover. The supervisor's annual salary in 2008 was an amount within the JCCP report's recommended salary range of between $35,843 and $46,506. The ordered raise would increase the supervisor's salary to an amount nearer the high end of the report's recommended salary range. When asked if he had concerns regarding the supervisor's current salary level, Judge Nemeth answered that he had "no direct indication" but there were "some noises that person is going to be retiring and will have to be replaced." (Tr. at 103-04, 181.) Asked if the supervisor was going to be retiring not because of the pay scale but because he is close to retirement age, Judge Nemeth acknowledged, "Yes. That's true." (Tr. at 181-82.)

In addition to the foregoing evidence about the employees, Judge Nemeth testified that he reviewed County budget records for the years 2006 through 2009 and discovered that many County employees in other departments had received raises during those years. (Tr. at 104-116,

16

160.) He admitted that some of those salary increases were attributable to grants and that the increase in salaries for probation officers was the result of "mandatory State law increases." (Tr. at 162.)

Even were we inclined to conclude, as the special judge did, that raises for these eight positions are reasonable, that alone is insufficient to uphold the mandate without proof of reasonable necessity for the operation of the court or a court-related function. Judge Nemeth relied upon the JCCP report in requesting and mandating the raises, and that report is the only evidence of any formal or systematic attempt to evaluate the appropriateness of the salaries. There was no systematic comparison of the salaries for these positions with similar positions in comparable counties. See Vigo County Council, 397 N.E.2d at 971-72 (affirming mandates that were accompanied by "several bar charts which compared the salaries paid to various court employees in 10 to 15 other Indiana counties of comparable size"). Nor was there comparison to salaries in contiguous counties, "the most useful benchmark for examining what salaries are 'reasonably necessary'" for a court to attract and retain qualified persons. Order for Mandate of Funds Montgomery County Council, 873 N.E.2d at 1047; see In the Matter of Court Reporter Salaries in the Knox Cir. and Super. Cts., 713 N.E.2d 280, 283-84 (Ind. 1999) (affirming raises where evidence included comparison of court reporters' salaries with those of the six other surrounding counties and sixteen counties of comparable size); In the Matter of Mandate of Funds in the Harrison Super. Ct., 674 N.E.2d 555, 557 (Ind. 1996) (affirming mandated raises for some employees where evidence showed salaries of similar positions in surrounding counties).

The evidence shows that of the eight positions in question, the 2008 salary for one of them (the bookkeeper position) was below the minimum salary range recommended in the JCCP report, the 2008 salaries for five of them were within the salary range recommend in the JCCP report, and that for the remaining two positions, there was no recommended salary range in the JCCP report. The Commissioners do not dispute the accuracy of the JCCP report, which we conclude justifies Mandate 3 with respect to the bookkeeper position.

The balance of the evidence concerning salaries for the other positions was anecdotal or conclusory and, thus, not helpful. Although the evidence showed that a few employees had left

for work elsewhere, the record is unclear regarding whether their new employment was in a similar position and whether low pay was the reason for their departure. There was no evidence or other data presented as to salaries in surrounding or comparably sized counties or other juvenile detention centers. This record does not show a clear and present danger of impairment of the court or court-related functions with regard to the remaining seven positions.

We also conclude that the cost of the raise for the bookkeeper position would not so severely and adversely affect any specific fiscal or other governmental interests so as to require that the raise be set aside. Accordingly, we affirm Mandate 3 regarding the bookkeeper position but reverse Mandate 3 with respect to the seven other positions.

Finally in relation to Mandate 3, we consider the court's cross-appeal argument that the special judge erred by vacating Mandate 3's original language that required the raises to be paid from the JPS Fund. The use of money in the JPS Fund is limited by statute. Money in a county's JPS Fund "may be used only for supplementing probation services and to supplement the salaries of probation officers[.]" Ind. Code § 31-40-2-2(b). A county's JPS Fund "may not be used to replace other funding or probation services." Ind. Code § 31-40-2-4. Additionally, money remaining in a county's JPS Fund at the end of the county's fiscal year does not revert to any other fund but remains in the county's JPS Fund. Ind. Code § 31-40-2-3.

In their motion to dismiss, the Commissioners argued that the court had no authority to mandate that the raises be paid from the JPS Fund because the raises were not for probation officers or supplementing probation services and such use of the JPS Funds would be illegal. Opposing dismissal, the court argued that it lawfully ordered payment of the raises from the JPS Fund because the raises would supplement probation services.

The special judge did not err by vacating Mandate 3's reference to the JPS Fund. We construed similar statutory language relating to the supplemental adult probation services fund and concluded, "The money in the fund may only be used to 'supplement,' *i.e., to fund new, or increases in existing, probation services* and to fund increases in the salaries of probation officers." Clark County Council v. Donahue, 873 N.E.2d 1038, 1041 (Ind. 2007) (emphasis added).

18

Here, the evidence does not show that the raises would fund new probation services or increases in existing probation services. Therefore, we agree with the Commissioners that the JPS Fund is not available to pay for the raise for the bookkeeper.

**IV**

We next address the court's cross-appeal argument that the special judge erred by vacating Mandate 1 in his preliminary order. As noted, Mandate 1 directed the Commissioners not to sell, assign, or otherwise transfer any interest in the undeveloped land east of the Center without the court's consent.

Although T.R. 60.5 speaks of the mandate of funds, we have concluded on several occasions that the procedures in that rule apply to orders of mandate relating to things other than court funding. See In the Matter of Courthouse Security in Tippecanoe County, 765 N.E.2d 1254 (Ind. 2002) (disagreement over how access to courthouse should be controlled); In the Matter of Assignment of Courtrooms, 715 N.E.2d 372 (dispute between commissioners and superior court judges over whether magistrates of circuit court or superior court judge would use particular courthouse room that superior court judge had been using); Bd. of Comm'rs of Crawford County v. Riddle, 493 N.E.2d 461 (Ind. 1986) (dispute over whether circuit court clerk or other county department would use particular room in county courthouse).

The Commissioners made a pre-trial motion to dismiss Mandate 1 and argued that Mandate 1 exceeds the court's mandate authority as a matter of law because, unlike the cases cited above, Mandate 1 does not involve building space or land currently being used for a court. Attached to the motion to dismiss was an aerial map of the Center and the eastern land. The court filed a response opposing dismissal. The court attached to its response copies of certain documents, including papers related to the bond issuance for the Center's construction and a copy of a letter it sent to the Commissioners on November 20, 2008, stating, in part, "The land to the east of the Juvenile Center was purchased as part of an overall land acquisition plan to provide room for expansion for the Juvenile Center in the future." (Appellee's App. at 14.)

19

In his preliminary order, the special judge found that the parties agree that the land at issue is undeveloped and that what is at issue is the land's potential, rather than immediate use. (Appellants' App. at 509.) The special judge granted the motion to dismiss and vacated Mandate 1. He found that the court issued Mandate 1 because of the land's potential use as a location for an additional building to house juveniles in the future. (Id.) He concluded, "If land is not used presently, it is hard to conceive of any set of facts by which it could be determined that a mandate was appropriate to assure that the [c]ourt could continue to function at a reasonable rate and in a dutiful manner." (Id. at 510.)

The court contends that dismissal of Mandate 1 was error because if that mandate is allowed to go to trial, the court

> will present evidence that there is a potential use for the land as a site for a non-secure long term residential placement facility to be operated by an organization that at present provides such services for the probate Court at a facility located out of state. . . . One of the out-of-state facilities currently accepting placements from the Probate Court has approached the Probate Court about building a residential facility for long term placements adjacent to the Juvenile Justice Center.

(Br. of Appellee at 54-55.) The court also suggests that if a new building were constructed on the eastern land, it could be leased to an operator for residential placement purposes. The court suggests that in either event, its evidence will show that the mandate order is reasonably necessary for the operation of the court or court-related functions. Accordingly, the court urges that the dismissal be reversed and Mandate 1 be set for trial.

When a mandate order is issued, the matter "shall be set for trial on the merits of such order to show cause" unless the mandated party or parties waive the right to trial and agree to make such appropriation or payment. T.R. 60.5(B). The purpose of this trial is to "provide a factual foundation, developed in a suitable adversary atmosphere, to permit a rational decision of the issues." State ex rel. Lake County Council v. Lake County Court, 266 Ind. 25, 359 N.E.2d 918, 920 (1977).

We conclude that Mandate 1 should not have been dismissed. The court's opposition to dismissal alleges that the eastern land was purchased as part of an overall land acquisition plan to

20

provide room for the Center's expansion in the future and that disposition would violate the terms of the bonds issued to finance the Center. And Mandate 1 states, among other things, that "preservation of this land is necessary and essential for the effective operation of juvenile justice in St. Joseph County." (Appellants' App. at 465.) The court should have been allowed an opportunity to prove what it alleged in opposing the motion to dismiss and in Mandate 1. Whether the court is able to prove the eastern land's reasonable necessity to the operation of the court or a court-related function remains to be determined, but Mandate 1 is sufficient to withstand the Commissioners' motion to dismiss.

## V

Finally, we address attorney fees. Because the proper delivery of judicial services is often at stake in T.R. 60.5 proceedings, we have recognized the necessity of proper compensation for attorneys who represent courts in such matters. <u>Order for Mandate of Funds Montgomery County Council</u>, 873 N.E.2d at 1049; <u>Kramer v. Hancock County Court</u>, 448 N.E.2d 1190, 1192 (Ind. 1983).

The factors to be considered in determining the reasonableness of a fee include the following: "(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent." Ind. Professional Conduct Rule 1.5(a)).

## A

The Commissioners challenge the special judge's award of $18,425 in attorney fees to the court's counsel.

To support his request for attorney fees, the court's counsel, James A. Masters, submitted an affidavit showing that he is an owner of a South Bend law firm and has practiced law since 1978. He affirmed he is familiar with the prevailing hourly rate charged by attorneys in the South Bend area for work in civil litigation. He stated that $250 per hour is a reasonable market rate for his services in light of the factors set out in Professional Conduct Rule 1.5(a). Attached to his affidavit is a statement of account showing that he spent 68.70 billable hours working on this case, which, at $250 per hour, totals $17,175. His affidavit concluded by stating that all of the time charges and expense reflected in the attached statement were reasonably and necessarily incurred in the representation of the court in this case. (Petitioner's Ex. 10.) The Commissioners offered no evidence on the issue of attorney fees.

In the final judgment, the special judge clarified that the last charge in the statement of account was an estimate for hours to prepare the closing argument[6] but that "[b]ased on the time actually spent to prepare the Closing Argument and the proposed Order, counsel represents that the charge should be 10 hours at $250 an hour. The total fee requested is $18,425." (Appellants' App. at 27.) The special judge wrote that the statement of account shows that Masters had been working on the case since January 2009, without pay. The special judge concluded,

> Any payment of fees to counsel for the Probate Court is contingent on this Court's order for payment. Given the novelty and the amount of work involved in this case, the experience of the counsel in this type of case, the fact that payment of the fee is contingent, and the hourly rate requested is a rate customarily charged in the locality, the requested fee at a rate of $250 an hour, for a total of $18,425 as adjusted, is reasonable and should be approved.

(Id. at 27.)

On their face, these attorney fees are well below those we have seen in some other mandate cases. See Order for Mandate of Funds Montgomery County Council, 873 N.E.2d at 1049 (approving fee award of $72,810 and noting $27,800 was the amount at issue in Allen County Council v. Allen Cir. Ct., 549 N.E.2d 364 (Ind. 1990)). The Commissioners do not

---

[6] The statement of account describes the charges as being for "Preparing Trial Brief or Closing Argument (estimated)." (Petitioner's Ex. 10.)

question whether $250 is an unreasonable hourly rate or whether the statement of account attached to Masters's affidavit accurately reflects the number of hours he worked on this case. The Commissioners do question, though, the reasonableness of three sets of charges in the statement of account submitted by Masters.

First, the Commissioners challenge the eight and one-half hours ($2,125) Masters billed for conferring with Judge Nemeth, researching legal issues, and preparing each of the mandates in late January and early February 2009. The Commissioners insist Judge Nemeth has legal training and could have performed these preliminary tasks himself, without counsel. The Commissioners' argument, taken to its logical conclusion, would mean that attorneys representing courts in mandate actions would not be entitled to any compensation because a judge could "do it all" without the assistance of counsel. We have rejected this conclusion implicitly when holding that attorneys are entitled to proper compensation for representing courts in mandate proceedings. Even if Judge Nemeth was qualified to perform these preliminary tasks himself, it was not error for the special judge to include these charges in the fee award.

The Commissioners next challenge the ten and one-half hours ($2,625) Masters billed for researching legal issues for the mediation statement and preparing a mediation statement. The Commissioners suggest those tasks should have taken less than two hours, but they presented no evidence on that issue and cite no authority in support of this argument. Therefore, this argument fails.

Finally, the Commissioners note the statement of account shows Masters spent five hours ($1,250) preparing a response to the motion to dismiss Mandate 1 and five hours ($1,250) preparing a response to the motion to dismiss Mandate 3. The Commissioners request some relief depending on how we resolve Mandates 1 and 3 in this appeal, so that the Commissioners are not required to pay the court attorney fees for argument on issues the court lost. Entitlement to attorney fees is not contingent on success on the merits. And frequently the research and drafting of dismissal motions and responses is a necessary predicate to subsequent argumentation at trial. There is no claim that the amount requested in this regard exceeded what was reasonable for the work involved. We find no error in the special judge's approval of this amount.

23

**B**

When this appeal was fully briefed, the court filed a motion in this Court for appellate attorney fees and costs. The court's motion states that the total appellate attorney fees and costs cannot be determined yet. It requests a remand following our decision so that the special judge may consider evidence of those fees and costs. The Commissioners have not opposed this motion.

Indiana Appellate Rule 67 allows parties to request an award of appellate costs to recover expenses such as filing fees, the cost of preparing a transcript, and postage. Because neither side completely prevailed in this appeal, we have discretion whether to award such costs. See App. R. 67(C). In our discretion, we determine that each side shall bear its own appellate costs.

Because the court's motion for appellate attorney fees shows that it may be entitled to appellate attorney fees and requests a remand, we remand to allow the special judge to hold a hearing to determine and award any appropriate appellate attorney fees to the court.

**Conclusion**

As indicated above, we reverse the dismissal of Mandate 1 and remand it for a trial. We affirm in part and reverse in part Mandate 2 and Mandate 3 as indicated above. Finally, we affirm the award of attorney fees and remand for a determination and award of the court's appellate attorney fees.

Shepard, C.J., and Rucker, J., concur.

Dickson, J., concurs in part and dissents in part with a separate opinion in which Boehm, J., concurs.

**Dickson, Justice, concurring and dissenting**

I concur except as to Part IV, in which the Court reverses the dismissal of Mandate 1 and remands it for further proceedings.  Believing that the special judge was correct to dismiss Mandate 1, I dissent to this part of the opinion.  In all other respects, I concur.

Boehm, J., concurs.